UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

JEFFREY A. HILSENDAGER,

        Plaintiff,

  v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

        Defendant.

Civil No. 6:14-cv-01955-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Jeffrey A. Hilsendager ("Hilsendager"), seeks judicial review of the final

decision by the Social Security Commissioner ("Commissioner") denying his applications

for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"),

42 USC §§ 401-433, and Supplemental Security Income ("SSI") under Title XVI of the

SSA, 42 USC §§ 1381-1383f. This court has jurisdiction to review the Commissioner's

decision pursuant to 42 USC § 405(g) and § 1383(c)(3). All parties have consented to allow

a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP

73 and 28 USC § 636(c). For the reasons set forth below, that decision is REVERSED and

REMANDED for award of benefits.

1 – OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Hilsendager protectively filed for DIB and SSI on Friday, May 21, 2010, alleging a disability onset date of January 1, 2007, which was later amended to September 15, 2007. Tr. 10, 38, 218–26.[1]  His applications were denied initially and on reconsideration.  Tr. 129–46.  On June 27, 2013, a hearing was held before Administrative Law Judge ("ALJ") Michael Kopicki.  Tr. 31–74.  The ALJ issued a decision on July 22, 2013, finding Hilsendager not disabled.  Tr. 7–30.  The Appeals Council denied a request for review on October 3, 2014.  Tr. 1–4.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR §§ 404.981, 416.1481, 422.210.

## BACKGROUND

Born in 1968, Hilsendager was 45 years old at the time of the hearing before the ALJ.  Tr. 41, 218.  He has a high-school education and past relevant work experience as a saw mill worker, construction worker, and auto-body repair helper.  Tr. 41, 65.  Hilsendager alleges that he is unable to work due to the combined impairments of degenerative disc disease, depression, anxiety, bulging discs, hand fungus, and Barrett's esophagitis.  Tr. 75.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on May 20, 2015 (docket #14).

inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098–99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the

claimant can perform other work in the national economy.  20 CFR §§ 404.1520(a)(4)(v) &

(g), 416.920(a)(4)(v) & (g); *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at

1099.

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180

F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show

that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner

meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(v) & (g),

416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

At step one, the ALJ concluded that Hilsendager has not engaged in substantial

gainful activity since September 15, 2007, the amended alleged onset date.  Tr. 12.

Hilsendager worked after that date, but his reported earnings did not rise to the level of

substantial gainful activity.  *Id*.

At step two, the ALJ determined that Hilsendager has the severe impairments of

degenerative disc disease and spondylosis of the cervical spine; kyphoscoliosis of the

thoracic spine with multilevel, small disc protrusions; hypertension; Barrett's esophagitis;

pain disorder due to psychological factors (depression); and general medical condition; and

alcohol abuse with possible dependence.  Tr. 13.

At step three, the ALJ concluded that Hilsendager does not have an impairment or

combination of impairments that meets or equals any of the listed impairments.  Tr. 14.  The

ALJ found that Hilsendager has the RFC to perform light work, "except he is able to lift

and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for about

six hours in an eight-hour workday with normal breaks."  Tr. 15.  He "can occasionally

push/pull with the upper extremities, should no more than occasionally climb ladders, ropes, and scaffolds, stoop, crouch, and crawl," "can frequently climb ramps and stairs, balance, and kneel" and "can perform occasional overhead reaching bilaterally.  *Id.*  But he "should avoid concentrated exposure to hazards, such as unprotected heights and dangerous machinery."  *Id.*  He is further limited to "understanding, remembering, and carrying out simple instructions," "making judgments on simple work-related decisions" but "otherwise has a moderate limitation with understanding, remembering, and carrying out complex instructions and making judgments on complex work-related decisions (moderate meaning will frequently be unable to understand and implement these tasks)."  *Id.*

Based upon the testimony of a vocational expert ("VE"), the ALJ determined at step four that Hilsendager's RFC precluded him from returning to his past relevant work.  Tr. 23.

At step five, the ALJ found that considering Hilsendager's age, education, and RFC, he was capable of performing the unskilled, light occupations of cashier, small parts assembler, and parking lot attendant.  Tr. 24.

Accordingly, the ALJ determined that Hilsendager was not disabled at any time through the date of the decision.  Tr. 25.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Ryan v.*

*Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481

F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir

2001).  Where the evidence is susceptible to more than one rational interpretation, the

Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn

from the record."  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), *quoting Batson*

*v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*,

504 F3d at 1035.

## DISCUSSION

Hilsendager argues the ALJ erred in three respects by:  (1) rejecting the opinion of

his treating physician, Timothy A. Hill, M.D.; (2) rejecting his subjective pain testimony;

and (3) finding that he retains the ability to perform other work in the national economy.

## I.    Treating Physician

### A.    Legal Standard

Disability opinions are reserved for the Commissioner.  20 CFR §§ 404.1527(e)(1),

416.927(e)(1).  If no conflict arises between medical source opinions, the ALJ generally

must accord greater weight to the opinion of a treating physician than that of an examining

physician.  *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  The ALJ should also give

greater weight to the opinion of an examining physician over that of a reviewing physician.

*Orn v. Astrue*, 495 F3d 625, 632 (9th Cir 2007).  If a treating or examining physician's

opinion is not contradicted by another physician, the ALJ may reject it only for clear and

convincing reasons.  *Id* (treating physician); *Widmark v. Barnhart*, 454 F3d 1063, 1067 (9th

Cir 2006) (examining physician).  Even if one physician is contradicted by another

physician, the ALJ may not reject the opinion without providing specific and legitimate

reasons supported by substantial evidence in the record.  *Orn*, 495 F3d at 632; *Widmark*, 454 F3d at 1066.  An ALJ may not substitute his opinion for that of a physician.  *Day v. Weinberger*, 522 F2d 1154, 1156 (9th Cir 1975).

      **B.**    **Pertinent Treatment Records**

On October 9, 2007, Hilsendager's treating physician at the time, Kent Yundt, M.D., ordered a cervical spine MRI that revealed "a moderate degree of bilateral foraminal stenosis from C5 to C7 where there is degenerative disc disease and broad-based protrusions of the discs at both levels."  Tr. 320.  A thoracic spine MRI two days later showed kyphoscoliosis with multilevel small disc protrusions "most prominent at T9-10 . . .  where a slight cord displacement occurs."  Tr. 319.  A disc protrusion was also seen at C6-7, displacing the lower cervical cord, and smaller ones at T2-3 and T5-6.  *Id.*

In June 2010, Hilsendager returned to Dr. Yundt for increasing cervical pain with headaches, numbness, and paresthesisas in the upper and lower extremities.  Tr. 431. Dr. Yundt observed that Hilsendager appeared "quite uncomfortable," was "weak globally" and "markedly hyperreflexive globally."  *Id.*

On July 2, 2010, another cervical MRI showed "spondylosis with chronic bulging or protruding discs throughout the cervical spine," "mild to moderate spinal canal stenoses, most pronounced at C5-6 and C6-7 secondary to chronic disc protrusions at these levels," "chronic protrusion at T2-3 eccentric toward the right" and "multifocal foraminal stenosis . . . most prominently affecting C5-6 and C6-7 on the left and C3-4 through C6-5 on the right."  Tr. 433.  Comparison to the 2007 MRI showed "mild interval progression of degenerative changes."  *Id.*  Dr. Yundt diagnosed hyperflexia, numbness/paresthesia,

cervical and lumbar radiculopathy, cervicalgia, and low back pain, and administered facet injections.  Tr. 427–29.

Hilsendager felt 30-40% better the next month.  Tr. 426.  Dr. Yundt advised another injection at a higher level that relieved Hilsendager's pain and recommended pursuing rhizotomies[2] at C4-5 and discussing long-term pain management with David Kane, M.D. Tr. 423-25.

In November 2010, Hilsendager reported that a rhizotomy at C4-5 was very helpful, but now his pain was lower in the cervical spine.  Tr. 444.  Dr. Yundt diagnosed cervical osteoarthritis and stated that "neurosurgery has little to offer" him.  Tr. 445.  He ordered a cervical SPECT exam and recommended further injections and treatment with Dr. Kane.  *Id.*

Hilsendager continued to receive facet injections from Dr. Kane through December 2011, but also continued to report pain, numbness and tingling in his left arm, and anxiety. Tr. 446, 448, 459, 461-62, 465, 469, 475.  In December 2011, he was prescribed Cymbalta to relieve his pain.  Tr. 467.  He also received regular chiropractic treatments from August 2010 through June 2012 to relieve his severe back and neck pain. Tr. 487-500.

In October 2012, Hilsendager was examined by Mike Henderson, M.D., at the request of the state agency.  Tr. 554.  He noted that Hilsendager seemed to lack insight into the medical history but had a tremor, seemed anxious, had pain in his paraspinal musculature from the T10 level to the lumbar area and into the sacrum, but his muscle strength was intact and sensation was normal.  Tr. 556.  Dr. Henderson concluded that Hilsendager had no functional limitations.  *Id.*

---

[2]  A rhizotomy is a surgical section of the spinal nerve roots for the relief of pain.  *Stedman's Medical Dictionary for the Health Professions and Nursing* (7th Ed., 2012), p. 1468.

In May 2013, Hilsendager asked Timothy A. Hill, M.D., to take over his future pain management.  Tr. 561.  He reported that he was struggling with worsening neck pain and more severe numbness radiating down his left arm and hand.  *Id.*  His arm numbness occurred with left neck rotation or left bending.  *Id.*  He also was struggling with considerable low back pain in a band-like pattern, radiating down the right leg.  *Id.*  On physical examination, Hilsendager's strength and sensation was intact except for slight numbness in the left hand with a positive Hoffman's reflex.  Tr. 562.  An electrodiagnostic examination of the left arm and right leg revealed a very mild carpal tunnel syndrome.  *Id.*  Dr. Hill assessed cervical spondylosis with multilevel foraminal narrowing with "a possible myelophathy related to stenosis" based on diffuse hyperreflexia.  Tr. 563.  Due to "significant, legitimate pain generators," Dr. Hill recommended ongoing hydrocodone therapy.  Tr. 564.

A cervical MRI dated May 29, 2013, revealed cervical spondylosis with bulging protruding discs from C2-3 through C6-7 and mild spinal canal stenosis at C5-6 and C6-7.  Tr. 601.  The foraminal narrowing appeared to have progressed since the July 2010 MRI. *Id.*

On June 13, 2013, Dr. Hill observed decreased cervical and lumbar motion by approximately 50% with bilateral facet loading and an equivocal Spurling's test.  Tr. 604. Phelan's test was mildly positive on the left and Tinel's signs over the cubital tunnel was positive.  *Id.*  Hilsendager's strength and sensation were intact except for slight numbness in the left hand.  Tr. 605.

///

///

9 – OPINION AND ORDER

C.    **Analysis**

On June 13, 2013, Dr. Hill stated that Hilsendager has intractable pain and

"significant, legitimate pain generators." Tr. 564. He opined that "due to [Hilsendager's]

considerable spine arthritis he will be living with waxing and waning pain." Tr. 605. As a

result, Dr. Hill concluded:

> The patient is felt to be quite limited from a physical standpoint
> due to severe cervical spondylosis and foraminal stenosis, with
> radiculitis. He also has underlying lumbar spondylosis and
> mild carpal tunnel syndrome. . . . He is limited to sedentary
> activities only due to all the above problems. Even in a
> sedentary capacity, I think he is at very high risk of time loss.
> He typically needs to lie down a couple times a day. He is
> [prone to] flares, which would probably keep him out of work
> for at least 3-4 days per month. I think he would have a very
> difficult time maintaining fulltime employment even in a
> sedentary capacity.

Tr. 605–06.

The ALJ gave Dr. Hill's opinion "less than substantial weight." Tr. 22-23. Because

the record contains contradictory medical opinions, the ALJ was required to provide specific

and legitimate reasons for rejecting Dr. Hill's ultimate conclusions.

As reasons for his conclusion, the ALJ first pointed to Dr. Hill's short treating

relationship with Hilsendager. Tr. 22. Dr. Hill examined and treated Hilsendager three

times from January to June 2013. Tr. 561–608. The frequency and nature of contact

between a doctor and patient are relevant factors in weighing a doctor's medical opinion.

20 CFR §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("treating sources . . . are likely to be the

medical professionals most able to provide a detailed, longitudinal picture of your medical

impairment"). Regardless of the number of visits, Dr. Hill conducted thorough

examinations, wrote detailed treatment notes based on objective testing, and observed

Hilsendager over a five-month period.  Therefore, Dr. Hill's opinion is entitled to greater weight than those of the consulting physicians and even Dr. Yundt, who treated Hilsendager shortly after the symptoms started.  *See Benton v. Barnhart*, 331 F3d 1030, 1037-39 (9th Cir 2003), quoting *Ratto v. Sec'y, Dep't of Health & Human Servs.,* 839 F Supp 1415, 1425 (D Or 1993) ("[t]he opinion of a physician who has treated the patient for an extended period of time is usually entitled to greater weight than a physician who has only examined the patient for SSA purposes, because the treating physician is employed to cure, and also has a greater opportunity to know and observe the patient over the course of time.").  Dr. Hill's opinion is especially valuable because he had the benefit of reviewing three cervical MRIs and Hilsendager's entire treatment history.  Therefore, the length of his treating relationship does not undermine his opinion.

Second, the ALJ found that that Dr. Hill's opinion was inconsistent with objective evidence and his own observations of mild symptoms.  Tr. 23.  A discrepancy between a treating source's medical opinions and the source's own treatment notes is a clear and convincing reason for not relying on the doctor's opinion regarding the claimant's functional limitations.  *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005).  Among his diagnoses, Dr. Hill concluded that Hilsendager suffered from mild lumbar spondylosis and carpal tunnel syndrome.  Tr. 605.  However, the ALJ failed to note that Dr. Hill also assessed "*severe* cervical spondylosis foraminal stenosis with radiculitis" that had progressed since the 2010 MRI, and lumbar spondylosis with probable disc degeneration. Tr. 600, 605 (emphasis added).

The ALJ also pointed to the electrodiagnostic test which was negative for signs of radiculopathy.  Tr. 23, citing 605.  However, Dr. Hill qualified that conclusion by stating

that "EMG testing cannot exclude a pure sensory radiculopathy." Tr. 562. Dr. Hill's examination revealed numbness, positive Hoffman's test, and a mildly positive Phalen's sign in Hilsendager's left hand. *Id.*

Third, the ALJ refused to "accept an argument of worsening symptoms given the lack of any consistent clinical findings to support it, the lack of persuasive, objective medical evidence to support it, the lack of more aggressive treatment, and . . . evidence of symptom exaggeration." Tr. 23. To the contrary, the 2013 MRI, interpreted by Jim Johnson, M.D., showed that the left-sided foraminal narrowing at C5-6 has progressed since the 2010 MRI. Tr. 600–01.

Fourth, the ALJ reasoned that Dr. Hill's conclusions were contradicted by his prescribed treatment of medications, a home stretching program, and a follow-up appointment four months later. Tr. 23. The record does not support that reason. Consistent with Dr. Yundt's earlier conclusion in 2007, Dr. Hill opined that surgery would be unhelpful due to the absence of a surgical lesion. Tr. 445, 605. Dr. Hill also suggested FRA (radiofrequency ablation rhizotomy) that had provided short-term relief in the past (Tr. 316, 318, 424-25, 427–28, 444, 448–49), but Hilsendager chose to delay that treatment until he had insurance coverage. Tr. 574-75.

As his fifth reason, the ALJ stated that "even a limitation to sedentary work would not at this point be disabling given the claimant's young age and vocational factors." Tr. 23. Although true as a general rule, other factors may preclude a claimant of Hilsendager's age from performing even sedentary work.

Sixth, the ALJ relied on contradictory opinions from other physicians. Tr. 23. Dr. Henderson examined Hilsendager once, and the ALJ rejected his opinion that

12 – OPINION AND ORDER

Hilsendager had no physical limitations.  Tr. 22.  In 2007, Dr. Yundt allowed Hilsendager to return to light duty after the early onset of his symptoms.  Tr. 315.  But when Hilsendager returned for treatment in 2010, Dr. Yundt observed that he was "weak globally" and "markedly hyperreflexic."  Tr. 429.  An MRI taken in 2010 showed mild to moderate canal stenosis at C5-6 and C6-7.  *Id*.  Although Dr. Yundt opined that the MRI did not explain Hilsendager's presenting symptoms, it is unclear whether Dr. Yundt thought Hilsendager lacked credibility.  More likely, Dr. Yundt felt more objective testing was needed, given that he ordered a bilateral C6-7 FJB (facet joint block) and CESI (cervical epidural steroid injection) and recommended a reevaluation.  *Id*.  Most importantly, neither Dr. Yundt nor Dr. Henderson had the chance to review the 2013 MRI and SPECT exam when forming their opinions. Therefore, the ALJ's improperly relied on these other physicians' opinions.

Finally, the ALJ rejected Dr. Hill's opinion that Hilsendager needed to lie down to rest if active during the day as speculative and entirely based on Hilsendager's less than credible reports.  Tr. 23.  As outlined above, Dr. Hill's conclusions were based on several clinical examinations and objective testing.  He is also the only pain specialist to assess Hilsendager's functional status based on his diagnosis.  Although his conclusions were partially based on Hilsendager's subjective complaints, Dr. Hill's specialty gives him the unique ability to assess the legitimacy of Hilsendager's tolerance for activity given his conditions.

Thus, the ALJ erred by failing to give legitimate reasons to reject Dr. Hill's opinion.

///

///

///

13 – OPINION AND ORDER

**II.**    **Claimant's Credibility**

    **A.**    **Testimony**

Hilsendager testified that he has chronic pain in his neck and lower back radiating through his spine. Tr. 45–46. The neck pain is constant and feels like a needle stabbing his vertebra when he stands up to walk. Tr. 46. He has associated numbness in his left arm, dizzy spells, and headaches shooting from the base of his skull to his eyes. Tr. 46, 48. The lower back pain is intermittent, but prevents him from lifting heavy objects and results in numbness in his left leg if he walks far. Tr. 47–48. The pain increases with daily activity, but is relieved by hot showers and lying flat on his back for 20-30 minutes a couple of times a day. Tr. 46. If he is active at all, he cannot get through the day without lying down. Tr. 61. Epidural injections did not decrease the pain, but nerve treatments (presumably referring to the rhizotomies) reduced his dizzy spells for a year and a half until the nerve grew back. Tr. 49.

    He tries to walk a block or "scramble" 200 yards a couple of times to get his heart rate up. Tr. 58-59. After standing 20 minutes, his body shakes and quivers for 30 minutes afterwards. Tr. 59. His ability to stand depends on his pain levels and he can sit 20-30 minutes at a time. *Id*. After 40 minutes at the hearing he was hurting "like crazy." *Id*. He cannot lift heavy objects but will help unload the groceries. *Id.*

    During the day while his wife works he tries to do some household chores. Tr. 56. His sons mow the lawn and do all the hard housework. *Id*. Hilsendager starts loads of laundry and can microwave meals. *Id.* But even reaching down in the dryer to get clothes out makes his whole body shake and pain shoot through his spine. Tr. 61. Because of numbness in his left hand, he uses his right hand for everything. Tr. 63.

14 – OPINION AND ORDER

B.    __Legal Standard__

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence and other evidence."  20 CFR §§ 404.1529(a), 416.929(a).  Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter*, 504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  A general assertion that the plaintiff is not credible is insufficient.  The ALJ "must state which [subjective symptom] testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993).  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant.  *Id*.

Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid.  *Tommasetti v. Astrue*, 533 F3d 1035, 1040 (9th Cir 2008).  Inconsistencies in a claimant's testimony, including those between the medical evidence and the alleged symptoms, can serve as a clear and convincing reason for discrediting such testimony.  *Burch v. Barnhart*, 400 F3d 676, 680 (9th Cir 2005); *Morgan v. Comm'r of Soc.*

15 – OPINION AND ORDER

*Sec. Admin.*, 169 F3d 595, 599 (9th Cir 1999).  Failure to seek medical treatment is also a

clear and convincing reason to reject a claimant's subjective statements.  *Burch*, 400 F3d at

681; *Fair v. Bowen*, 885 F2d 597, 603-04 (9th Cir 1989); *see also* SSR 96-7p, 1996 WL

374186 (July 2, 1996).

Credibility determinations are within the province of the ALJ.  *Fair*, 885 F2d at 604,

citing *Russell v. Bowen*, 856 F2d 81, 83 (9th Cir 1988).  Where the ALJ has made specific

findings justifying a decision to disbelieve an allegation of excess pain, and those findings

are supported by substantial evidence in the record, the role of the reviewing court is not to

second-guess that decision.  *Id*.

### C.    Analysis

First, the ALJ discredited Hilsendager's testimony because it was inconsistent with

the objective medical evidence and his treatment history.  Tr. 16.  He explained that:

> Until quite recently, clinical findings regarding the neck and
> extremities are relatively unremarkable.  I am dubious about the
> reliability of recent abnormal clinical findings based on effort-
> dependent testing within [Hilsendager's] control given the longitudinal
> record, which includes symptom amplification, as well as the lack of
> any muscle atrophy.

Tr. 20.

Hilsendager's treatment history beginning in 2007 contains MRI evidence of

bilateral foraminal stenosis with disc protrusions in the cervical and thoracic spine.  Tr. 319-

20.  The ALJ improperly concluded that Hilsendager's pain and numbness should result in

muscle atrophy and loss of strength.  "[J]udges, including administrative law judges of the

Social Security Administration, must be careful not to succumb to the temptation to play

doctor."  *Schmidt v. Sullivan*, 914 F2d 117, 118 (7th Cir 1990) (citation omitted).  In any

event, Dr. Yundt in June 2010 observed that Hilsendager was weak globally and markedly

hyperreflexic.  Tr. 431.

Second, the ALJ discredited Hilsendager based on his "good response to injections

and physical therapy."  Tr. 20.  In 2007 and 2010, under Dr. Yundt's care, Hilsendager

experienced some improvement in his range of motion and muscle tightness after receiving

cervical epidural steroid injections, facet blocks and physical therapy.  Tr. 310-18, 423, 426.

However, he continued to experience numbness in his hands and pain.  Tr. 312, 461.  At one

point in August 2010, the facet blocks provided "total improvement," but he returned three

months later complaining of pain in his cervical, thoracic, and lumbar spine.  Tr. 423, 444.

This is consistent with Dr. Hill's projection that "due to his considerable spine arthritis, he

will be living with waxing and waning pain."  Tr. 605.

Third, the ALJ pointed to Hilsendager's lack of mental health treatment as support to

find that his testimony of severe anxiety was less than credible.  Tr. 20.  The consultative

psychologist did not find any disabling mental impairment (Tr. 536) and Hilsendager agrees

that his physical pain is his greatest limitation.  However, his chronic pain has led to

depression and anxiety for which he has sought treatment and been prescribed anti-anxiety

medication.  Tr. 574.

Fourth, the ALJ noted that Hilsendager's claims of stomach pain from his

medications were inconsistent with his function report.  Tr. 20.  Hilsendager completed his

function report in 2010.  Tr. 286.  His stomach pain began several years later in 2013 after

he resumed taking his anxiety medication, Cymbalta, at Dr. Hill's recommendation.

Tr. 574, 607.  Because Hilsendager's testimony is confirmed by the treatment notes and is

not inconsistent with his earlier function report, this reason is neither clear nor convincing.

Finally, the ALJ cited an inconsistency between Hilsendager's "reported activities and demonstrated abilities." Tr. 21. Specifically, the ALJ cited Hilsendager's work as a fence installer up to the amended, alleged onset date that "portrayed him[] as ready, willing, and able to work." *Id*, citing 237, 243. However, his last job lasted only three weeks, and the heavy lifting caused him to "come home in tears." Tr. 43. Hilsendager also worked as a laborer after the alleged onset date but not in substantial gainful activity. Tr. 233, 237. The ALJ pointed out that Hilsendager had not tried light work and the disability claims representative that conducted his telephone interview noted that he demonstrated no difficulties over the phone. Tr. 21, citing 248. The absence of jobs requiring only light work among Hilsendager's past relevant work has no bearing on his credibility. Furthermore, the claims representative could not assess Hilsendager's physical comfort over the telephone or tolerance for sitting or standing for long periods of time. Therefore, neither of these reasons to discredit Hilsendager's testimony is supported by the record.

The ALJ generally overstated Hilsendager's activities and essentially characterized him as uninhibited in his daily activities. Tr. 21. While Hilsendager does help around the house as much as he can, any activity during the day requires him to rest as much as several times a day. Otherwise, his day is interrupted by his need to take hot showers to relieve the pain. Tr. 46.

Thus, the ALJ failed to give clear and convincing reasons to discredit Hilsendager.

## III.  <u>Remand</u>

Remand for further proceedings is appropriate when "outstanding issues" remain. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010). The court may, but is not required to, "credit as true" rejected evidence prior to remand. The "crediting as true" doctrine is not a

mandatory rule in the Ninth Circuit "when, even if the evidence at issue is credited, there are 'outstanding issues that must be resolved before a proper disability determination can be made.'" *Id*, quoting *Vasquez v. Astrue*, 572 F3d 586, 593 (9th Cir 2009).

The VE testified that if Hilsendager was limited to sedentary work and missed work three to four days per month, he could not retain employment on a sustained basis. Tr. 68-69. The VE also testified that no alternate jobs exists that permit an employee to lie down outside of normal break times. Tr. 69.

As discussed above, the ALJ erred in several respects. If Hilsendager's testimony is credited, as well as the opinion of Dr. Hill, substantial evidence in the record supports only one conclusion, namely that Hilsendager cannot perform her past relevant work and, indeed, can perform no work due to his condition. Hilsendager's need to lie down and take hot showers throughout the day to relieve his pain will continue on a waxing and waning basis. Thus, it is clear that the ALJ would be required to find Hilsendager disabled if that evidence is credited.

## **ORDER**

For the reasons discussed above, the Commissioner's decision is REVERSED and REMANDED pursuant to sentence four of 42 USC § 405(g) for an award of benefits.

DATED February 10, 2016.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge